**STATE of Minnesota, Respondent,**

v.

**Brian Eugene DANA, Appellant.**

**No. C4–87–350.**

Court of Appeals of Minnesota.

Dec. 8, 1987.

Review Granted Feb. 12, 1988.

---

148

Hubert H. Humphrey, III, Atty. Gen., St. Paul, Thomas Foley, Ramsey Co. Atty., Steven C. DeCoster, Asst. Co. Atty., St. Paul, for respondent.

C. Paul Jones, State Public Defender, Jonathan G. Steinberg, Asst. Public Defender, Minneapolis, for appellant.

Considered and decided by PARKER, P.J., and NIERENGARTEN and RANDALL, JJ., with oral argument waived.

## OPINION

PARKER, Judge.

A jury found appellant Brian Dana guilty of six counts of intrafamilial sexual abuse against his two sons, C.D. and T.D., under Minn. Stat. §§ 609.3641, subd. 1(2)(e); 609.-3642, subd. 1(2)(e) (1984). Dana failed to appear for sentencing. Approximately one year later, Dana was arrested in Nevada and extradited to Minnesota for sentencing. The trial court sentenced Dana to two consecutive 43–month terms. Dana appeals, challenging several evidentiary rulings and the jury instructions. We reverse and remand for a new trial.

## FACTS

Anita Flores and Brian Dana were married in 1978. Their son, C.D., was born in November 1979. Another son, T.D., was born in January 1981. In November 1981 they were divorced. The divorce was quite bitter, and the parties have continued to litigate visitation, custody and child support. After the divorce, C.D. and T.D. stayed with Dana one weekend each month.

At times relevant to the trial, Dana lived with Jeffrey Lewis. According to Dana, they had a long-term, intimate relationship.

Beginning in the spring of 1983, Mrs. Flores became concerned about the children's behavior, which became increasingly aggressive, argumentative and disrespectful. By the fall of 1984, C.D. had nightmares every night, sometimes several times a night. T.D. began wetting his bed at night and at naptime, even though he

had been toilet-trained almost a year earlier.

The teachers at Neighborhood House, where the boys went to school, were also troubled by their aggressive behavior. On several occasions they sent notes home to their mother identifying specific incidents of disruptive behavior.

Mrs. Flores observed that particularly bad behavior often followed the boys' visits with Dana. After their January 1985 visit with Dana, Mrs. Flores began to suspect sexual abuse; the boys behaved inordinately badly and returned from their visit with dirty clothes but clean pajamas.

At the suggestion of a Ramsey County domestic relations officer, in February 1985 Mrs. Flores saw Dr. Sandra Hewitt, a child psychologist, about possible sexual abuse. Dr. Hewitt specializes in sexual abuse cases and has evaluated over 300 sexually abused children.

Dr. Hewitt then saw the boys weekly until trial. Initially, the boys were guarded in their discussions with Dr. Hewitt. By the end of February, she was unable to substantiate whether the boys had been sexually abused.

On March 5, 1985, while the Neighborhood House teachers were discussing "bad touches" with the children, C.D. suddenly exclaimed, "Brian used to touch my private parts." The boys called their father "Brian."

Later that evening, Mrs. Flores questioned C.D. about this incident in the presence of T.D. and John Flores, Mrs. Flores' husband. C.D. stated that Dana had touched him and T.D. on their penises and butts. Hesitant to talk, C.D. demonstrated on a stuffed monkey doll how he claimed Dana had touched him. He further stated that Dana put his mouth on C.D.'s penis. C.D. said this activity occurred at Town Square, at Lewis' apartment, and at his grandparents' house.

When separated from C.D., T.D. voluntarily told Mr. Flores that Dana put his penis in T.D.'s mouth, that T.D. bit it and that he did the same to Dana. He said this happened at his grandparents' house and at Lewis' apartment.

For a month after the Neighborhood House incident, Dr. Hewitt was still unable to substantiate sexual abuse. C.D. described acts of abuse on T.D., but not himself, and could not demonstrate the abuse of T.D. on anatomically correct dolls. T.D. said he was afraid to discuss any abuse.

After interviewing the boys together in early April, Dr. Hewitt concluded the abuse was substantiated and accordingly reported the matter to Child Protection. C.D. said he and T.D. got "bad touched" on their penises and bottoms at Dana's. T.D. stated that Dana bit him on his penis. On this occasion Dr. Hewitt observed that the boys conversed fluidly about the touching, expressing appropriate emotions of agitation and anger.

Subsequently, Dr. Hewitt formed the opinion that the boys' aggressive play was consistent with the behavior of sexually abused children. She also testified that C.D.'s pictures were consistent with those of sexually abused children.

Dr. Carolyn Levitt, a pediatrician, examined C.D. and T.D. in mid-April. Although she found no physical evidence of abuse, her findings were consistent with the type of touching the boys had described. C.D. said Dana had "bad touched" T.D. but not him. C.D. nevertheless demonstrated how someone had squeezed his penis. T.D., more willing to talk, demonstrated on his own body how Dana touched his rectum and penis. It was Dr. Levitt's opinion that the boys had been sexually abused, that C.D. was especially reluctant to talk, and that a young child cannot be programmed to reveal the details of the boys' experiences.

A few days later, Maplewood Police Sergeant John Atchison interviewed the boys separately. T.D. indicated that Dana had touched his penis and his butt at his grandparents' house. T.D. also indicated that C.D. had been touched. C.D. said Dana had sucked on his penis, demonstrating the sucking motion with his lips. C.D. said this happened at his grandparents' house in the bathroom. Atchison interviewed the boys

again a couple of days later before a video camera. T.D. was reluctant to talk; his statements were mixed with denial and inconsistent statements. C.D. essentially repeated what he had said three days earlier.

The trial court found C.D. competent and T.D. incompetent to testify. Dr. Levitt, Dr. Hewitt, the Floreses and Sergeant Atchison were permitted to testify to essentially all of the boys' out-of-court statements—those about themselves and about each other. Dana testified, denying guilt, and called family members to testify on his behalf.

## ISSUES

1. Did the trial court err in admitting hearsay statements under Minn. Stat. § 595.02, subd. 3 (1986)?

2. Did the trial court properly exercise its discretion in admitting expert testimony that the children had been sexually abused and regarding the children's truthfulness?

3. Did the trial court properly exercise its discretion in excluding evidence on its own motion and properly instruct the jury on proof beyond a reasonable doubt?

## DISCUSSION

### I

Dana contends the trial court erred in admitting as substantive evidence C.D.'s and T.D.'s out-of-court statements to their mother, stepfather, teachers, child psychologist, pediatrician and police. This evidence was admitted under Minn. Stat. § 595.02, subd. 3 (1986), over Dana's continuing objection.

Minn. Stat. § 595.02, subd. 3 provides:

An out-of-court statement made by a child under the age of ten years * * * alleging, explaining, denying, or describing any act of sexual contact or penetration performed with or on the child * * * not otherwise admissible by statute or rule of evidence, is admissible as substantive evidence if:

(a) the court * * * finds, in a hearing conducted outside of the presence of the jury, that the time, content, and circumstances of the statement and the reliability of the person to whom the statement is made provide sufficient indicia of reliability; and

(b) the child * * * either:

(i) testifies at the proceedings; or

(ii) is unavailable as a witness and there is corroborative evidence of the act; and

(c) the proponent of the statement notifies the adverse party of the proponent's intention to offer the statement and the particulars of the statement sufficiently in advance of the proceedings at which the proponent intends to offer the statement into evidence to provide the adverse party with a fair opportunity to meet the statement.

(Emphasis supplied).

### Hearing

■ A prerequisite to admitting any out-of-court statement under section 595.02, subd. 3, is that the trial court conduct a hearing and make the findings required under subdivision 3(a). Here, the trial court did not hold a formal hearing despite Dana's request for one. Instead, it reviewed the court file containing the out-of-court statements and determined that the statutory requirements had been met. Dana made timely objection. Such a review does not meet the statutory requirements of a hearing.

■ We recognize that a hearing to assess the reliability of each of the statements and the person to whom they were made may be time-consuming. Nevertheless, considerations of judicial economy do not justify denying a legislatively mandated hearing which has been duly requested. We hold that the trial court committed plain error in failing to hold the requested hearing.

### Boys' Statements Concerning Abuse of Each Other

■ Minn. Stat. § 595.02, subd. 3, does not permit the substantive use of out-of-court statements by one child about acts of abuse against another child. *See State v. Bellotti*, 383 N.W.2d 308, 314 (Minn.Ct.

App.1986), *pet. for rev. denied* (Minn. April 24, 1986). The trial court committed plain error in admitting such statements. While C.D. testified and could be cross-examined about his out-of-court statements, T.D. was incompetent to testify and thus unavailable for cross-examination, yet his out-of-court statements concerning abuse, not only of himself but of C.D., were admitted.

■ Some of the boys' hearsay statements which were inadmissible under Minn. Stat. § 595.02, subd. 3, may have been admissible under other exceptions to the rule against hearsay. We cannot conclude as a matter of law, as the *Bellotti* court did, *see* 383 N.W.2d at 314, that the boys' out-of-court statements about each other were so reliable that they would have been admissible under the residual exception. *See* Minn. R. Evid. 803(24), 804(b)(5). Dr. Hewitt testified that sexually abused children often deny sexual abuse, saying, "it happened to the other guy but not me."

### Prejudice

Absent prejudice, these errors might not entitle Dana to a new trial. *State v. Burns*, 394 N.W.2d 495, 498 (Minn.1986). In *Burns* the supreme court reversed this court's decision ordering a new trial, because the defendant did not receive a section 595.02, subd. 3, hearing. Three factors justified the reversal. First, the defendant did not specifically object to the lack of a hearing. *Id.* at 497. Second, the lack of a hearing was not prejudicial, because the statements were clearly admissible. *Id.* at 497, 498. Third, even if the trial record did not establish that the evidence was properly admitted, a post-conviction hearing would be able to establish that the evidence had sufficient guarantees of trustworthiness to justify admission. *Id.* at 498.

■ As discussed, the first two factors are not apparent here. We also believe a post-conviction evidentiary hearing would not remedy the errors because, when combined with other incidents at trial, the errors were so prejudicial as to require a new trial. Specifically, Dr. Hewitt testified that in her opinion Dana and Lewis had sexually abused the boys. Although her particular area of expertise may have qualified her to give an opinion that the boys had been sexually abused, her qualifications did not make her competent to identify the perpetrators. Despite Dana's failure to object to this testimony, we are troubled by it.

■ We also find disturbing the trial court's questioning of C.D. after redirect examination. The judge asked C.D. whether he told his teacher and Sergeant Atchison what really happened and whether he told them the truth. The following colloquy then took place:

THE COURT: Okay. You're a pretty good young man, aren't you?

[C.D.]: (Nods head affirmatively).

THE COURT: Okay. Did you have a good time when you came here today?

[C.D.]: (Nods head affirmatively).

THE COURT: Good. Well, I think we're all done with you. Would you like to go back now and go home?

[C.D.]: Yes.

THE COURT: That-a-boy. Thanks much. Bye-bye.

[C.D.]: Bye.

Minn. R. Evid. 614(b) provides that the court may interrogate witnesses on its own initiative. Nevertheless, this prerogative should be exercised with great caution, especially if the credibility of key witnesses is at issue. *State, on Behalf of Hastings v. Denny*, 296 N.W.2d 378, 379 (Minn. 1980). Caution is especially critical in criminal cases. *State v. Olisa*, 290 N.W.2d 439, 440 (Minn.1980).

We recognize that Dana did not object to this questioning as required by the rule. *See* Minn. R. Evid. 614(c). We are concerned, however, that the judge's kindly intentions of reassuring the child, who was undoubtedly under great stress, may have had the unintended effect of seeming to put the court's imprimatur on the child's testimony when his credibility was a critical issue in the case.

### II

Dana contends the trial court denied him a fair trial by admitting Dr. Levitt's and

Dr. Hewitt's opinions that T.D. and C.D. had been sexually abused.

The admissibility of expert testimony lies within the sound discretion of the trial court. *State v. Hall*, 406 N.W.2d 503, 505 (Minn.1987). The test for admitting an expert's opinion is whether it will be helpful to the jury. *Id.* It is not grounds for objection that the opinion embraces an ultimate issue to be decided by the trier of fact. Minn. R. Evid. 704.

■ Expert testimony describing the traits and characteristics typically found in sexually abused children and those the expert has observed in the complainants is admissible. *State v. Myers*, 359 N.W.2d 604, 609 (Minn.1984).

> By explaining the emotional antecedents of the victim's conduct * * *, an expert can assist the jury in evaluating the credibility of the complainant.

*Id.* at 610. Dr. Hewitt described preschoolers' thought processes; their ability to fabricate stories of sexual abuse with which they have had no experience; how sexual abuse in children is usually manifested in a variety of modalities, such as in their play, drawings and emotions; their ability to organize their experiences; and the likelihood that they might lie about sexual abuse. This evidence was admissible under *Myers*.

■ An expert may also testify properly that the child's behavior is consistent with the profile of a sexually abused child. *See id.* at 611. Dr. Levitt testified that, though there was no physical evidence of abuse, the boys' physical examinations were consistent with the type of abuse they had described. Dr. Hewitt testified that C.D.'s and T.D.'s behaviors were consistent with that of other sexually abused children she had observed.

With preschoolers, an expert's opinion concluding that a child has been sexually abused is helpful to the jury and thus admissible. The

> jurors are * * * faced with determining the veracity of a young child who tells of a course of conduct carried on over an ill-defined time frame and who appears an uncertain or ambivalent accuser and who may even recant.

*Id.* at 610. Dr. Levitt's and Dr. Hewitt's opinions that C.D. and T.D. had been sexually abused were properly admitted.

■ Dana contends he was also denied a fair trial because of the following colloquy between Dr. Hewitt and the prosecutor:

> Q: Do you have any reason to believe that either [C.D.] or [T.D.] are lying about being sexually abused by their father and [Lewis]?
>
> A: No, I have no reason [to] believe that they might be lying.

We agree this question was objectionable. As a general rule, a court should reject expert opinion testimony regarding the truth of a witness' allegations about a crime. *Id.* at 611. Nevertheless, because Dana did not make a timely objection, he is deemed to have waived it.

### III

■ We hold Dana's argument—that the trial court's exclusion of evidence on its own motion and limitation of his questioning of witnesses denied him a fair trial and displayed partiality to the jury—to be without merit. Dana failed to make an offer of proof on any of the excluded evidence. *See* Minn. R. Evid. 103(a)(2). Moreover, the trial court properly excluded evidence which was largely irrelevant, repetitive and tangential, *see* Minn. R. Evid. 402, 403, and evidenced no uneven treatment.

■ The trial court properly refused Dana's requested instruction that the jury would have to be morally certain of the decision to convict him. The morally certain language need not be given. *See* 10 Minnesota Practice, CRIM JIG, 3.03 (1985) comment; *State v. Boykin*, 312 Minn. 593, 594, 252 N.W.2d 604, 606 (Minn.1977) (trial court has the discretion to exclude the "moral certainty" definition). Because the instruction as a whole fairly and correctly stated the applicable law, Dana would not be entitled to a new trial on this basis. *See Parr v. Cloutier*, 297 N.W.2d 138, 140 (Minn.1980).

## DECISION

The trial court committed plain error in failing to conduct the hearing required by Minn. Stat. § 595.02, subd. 3(a), and in admitting the children's out-of-court statements about acts of abuse against each other. These errors, coupled with the child psychologist's identification of Dana as a perpetrator and the judge's questioning of C.D., were prejudicial.

Reversed and remanded for a new trial.